# SULLIVAN,

## DECEMBER TERM, A. D. 1853.

## JARVIS & a. ADMR'S v. BROOKS & a. ADMR'S.

Where real estate is bought with partnership funds and used for partnership
purposes, it is unnecessary that there should be any special agreement, in
order to make it the property of the firm.

Where real estate is owned and used for partnership purposes, and is attached
by creditors of the individual members of the firm, a subsequent attachment
by creditors of the firm will take precedence of the first attachment.

The real estate of a firm was attached by the defendant's intestate, who was a
creditor of the firm, and, subsequently, on the same day, was attached by the
plaintiff's intestate, who was a creditor of the individual members of the firm.
The plaintiffs' execution was levied on the 30th of August, 1849, and the de-
fendants' execution was levied on the 15th of March, 1849. The plaintiffs
contended that the defendants' attachment was dissolved as against the sub-
sequent attachment by the plaintiffs, by taking a judgment for the defendant
for a greater amount than the *ad damnum* in the writ, and by levying upon a
greater amount of property than was attached by the defendants' writ. *Held*,
that as the partnership creditor had precedence, the questions as to the
dissolution of the attachment did not arise, nothing more being necessary than
that such creditor should have a valid execution, properly levied, in order to
avail himself of his right of priority.

WRIT OF ENTRY to recover certain lands, situated in
Claremont, lately occupied by Leonard Gilmore and Hiram
Gilmore, comprising a tract of land lying upon the west
side of the road, called the blacksmith shop plot. And also,
a tract of land on the east side of the road, called the grist
mill plot.

The action is brought by Dwight Jarvis and Jabez B.
Upham, administrators of George B. Upham, against Lyman

Brooks and Daniel J. Warner, administrators of Nathaniel Grout.

On the 27th day of December, 1826, John Tyler and James B. Andrews, being seized thereof in fee, by warranty deed, for the consideration of $1,000, expressed in the deed, conveyed to Leonard Gilmore and Hiram Gilmore, their heirs and assigns, five undivided eighth parts of said blacksmith shop plot, west of the road; and on the 26th day of September, 1827, Austin Tyler, administrator of Benjamin Tyler, who was duly seized thereof at his decease, by warranty deed, in his said capacity, in consideration of $581,25, conveying the remaining three undivided eighth parts of the blacksmith shop plot to Leonard and Hiram Gilmore.

On the 26th day of September, 1827, Austin Tyler, administrator of Benjamin Tyler, who died seized thereof, for the consideration, as expressed in the deed, of $1,455, conveyed one undivided half of the tract of land on the east side of the road, called the grist mill plot, to Leonard Gilmore, Hiram Gilmore, Ilock Hills and Morris Clark. On the same 26th day of September, 1827, said John Tyler, for the consideration of $1,500, as expressed in the deed, being duly seized thereof, conveyed the other undivided half of the tract east of the road, called the grist mill plot, to Leonard and Hiram Gilmore, Ilock Hills and Morris Clark.

On the 23d day of February, 1828, Morris Clark, for the consideration of $981, expressed in the deed, conveyed an undivided fourth part of the grist mill plot, east of the road, to Leonard Gilmore, Hiram Gilmore and Ilock Hills.

On the 21st day of May, 1829, Leonard and Hiram Gilmore, in consideration of $516,67, conveyed to Ilock Hills one undivided third part of the blacksmith shop plot, west of the road; on the 29th day of July, 1829, Ilock Hills, Leonard Gilmore and Hiram Gilmore, in consideration of $1,425, conveyed an undivided fourth part of both said grist mill and blacksmith shop plots to Gawin Gilmore; and on the

1st day of October, 1829, Ilock Hills conveyed to Gawin Gilmore, Leonard Gilmore and Hiram Gilmore, all his interest in the blacksmith shop plot and the grist mill plot. The consideration in the deed is $1,200,50.

On the 21st day of November, 1827, Samuel P. Fiske, being duly seized thereof, for the consideration in the deed of $750, conveyed a lot of land in Claremont, called the store lot, to Leonard Gilmore, Hiram Gilmore, Ilock Hills and Morris Clark. On the 23d of day of February, 1828, for the consideration, as expressed in the deed, of $981, Morris Clark conveyed an undivided fourth part of said store lot to Leonard Gilmore, Hiram Gilmore and Ilock Hills. On the 29th day of July, 1829, Ilock Hills, Leonard Gilmore and Hiram Gilmore, for the consideration of $1,425, as expressed in the deed, (in addition to the property west and east of the road) conveyed to Gawin Gilmore an undivided fourth part of the store lot. On the 1st day of October, 1829, Gawin Gilmore, Hiram Gilmore and Leonard Gilmore, for the consideration expressed in the deed of $562,50, conveyed all their interest in three undivided fourth parts of the store lot to Ilock Hills. On the 5th day of May, 1829, Gawin Gilmore, for the consideration of $35, expressed in the deed, conveyed to Leonard Gilmore, Hiram Gilmore and Ilock Hills, the Clover Mill, which has formed an exception in the other deeds conveying the grist mill plot east of the road.

On the 7th day of September, 1841, George B. Upham purchased a writ of attachment out of the clerk's office in this county, of that date, against Leonard Gilmore and Hiram Gilmore, and Gawin Gilmore and Ilock Hills, and caused the lands in controversy in this action, together with other lands, to be attached in virtue of said writ, subject to nine former attachments in favor of Upham and other persons. The declaration was upon sundry notes, signed by the Gilmores and Hills, each of them in his individual name, and the signers, jointly and severally promised to pay the notes to George B. Upham or order. Ilock Hill's name

was placed first on each of the notes, and he received the money of Mr. Upham upon each. Mr. Upham had no other knowledge for whose benefit the money was procured or designed. No property of Ilock Hills was attached, and the writ was returned *non est* as to him, and was duly served upon all the other signers.

Judgment was recovered in this action at the court of common pleas, August term, 1849, in this county, in favor of the plaintiffs, against Leonard and Hiram Gilmore only, Gawin Gilmore having deceased before that time, for the sum of $5,000 damages and $18,57 cost. Execution was duly issued thereon on the 30th of August, 1849, and the same was duly levied upon one undivided third part of the blacksmith shop plot and of the grist mill plot, as the property of Hiram Gilmore, and one-third part thereof as the property of Leonard Gilmore, and seizin thereof duly delivered to the plaintiffs, and due return of the levy made by the officer making the same.

Leonard Gilmore, a witness called by the defendant, testified that Leonard and Hiram Gilmore commenced business as partners, under the name of Leonard & Hiram Gilmore, in West Claremont, in the early part of December, 1826 ; that the consideration paid for the deed of Tyler & Andrews to Leonard & Hiram Gilmore was paid in part down, to wit, $600 out of the funds of the partnership, and the residue by notes as hereinafter mentioned, which were paid by Gilmore, Hills & Co. The consideration of the deed of Tyler, administrator, to Leonard & Hiram Gilmore, was paid out of the funds of Gilmore, Hills & Co., a partnership formed soon after the date of the deed, composed of Leonard and Hiram and Ilock Hills and Morris Clark. In each case, notes were at first given for the consideration, excepting $600, signed by Leonard & Hiram Gilmore, and by Gawin Gilmore as surety. Hills and Clark came in, each purchasing a fourth part of the grist mill plot, east of the road. Of the consideration of the deed of John Tyler

to Leonard & Hiram Gilmore and Ilock Hills and Morris Clark, a part was paid down, and for the residue notes were given, one to John Tappan, one to George B. Upham, one to Silas H. Sabin, creditors of the grantor, and one to Anna Tyler, for her dower. The note to S. H. Sabin for $475, the note of $150 to Mrs. Tyler, and a note for $300 were paid out of the funds of Leonard & Hiram Gilmore, and the residue of the notes has not been paid. About February, 1828, the other members of the firm purchased out Morris Clark, and Clark conveyed to them his interest in the real estate east of the road; then the firm consisted of Leonard and Hiram Gilmore and Ilock Hills.

The consideration for the clover mill was $350, and a note was given for it, signed by Gawin Gilmore, and indorsed by Gilmore, Hills & Co., about the time Gawin Gilmore conveyed the clover mill to Leonard & Hiram Gilmore and Ilock Hills, payable to Tyler and Andrews, and Gilmore, Hills & Co. paid it, which name was still retained after Clark had retired therefrom. There was no consideration for the deed of Leonard & Hiram Gilmore and Ilock Hills to Gawin Gilmore, of July 29, 1829, other than his signing sundry notes for the firm, and he was to re-convey when they were paid.

The firm of Gilmore, Hills & Co. was dissolved about October 1, 1829, and Hills went out, and the firm then consisted of Leonard and Hiram Gilmore, under the partnership name of L. & H. Gilmore. Gawin Gilmore was never a partner in either of the firms.

At the dissolution of Gilmore, Hills & Co., the store and goods were conveyed to Hills, and he released to Leonard and Hiram and Gawin Gilmore all his interest in the blacksmith shop plot and the grist mill plot. L. & H. Gilmore became liable for the debts of Gilmore, Hills & Co., who paid for the store out of the partnership funds. For the reason that Gawin Gilmore conveyed to Ilock Hills his interest in the store, Ilock Hills conveyed to Gawin Gilmore

his interest in the blacksmith shop plot and the grist mill plot. There was no other change in the title to the property prior to September 7, 1841, the date of the attachment. On the premises west of the road, when purchased, there was a trip-hammer shop, coal house, a dwelling-house, consisting of two tenements, a small barn and a ware shop. On the east side of the road there was a grist mill, dwelling-house, horse shed, and also a clover mill. After the purchase, Gilmore, Hills & Co. built a barn at their expense, which cost $200. L. & H. Gilmore built a grist-mill, and saw-mill, and shingle-mill and a horse shed, a house and out-buildings, a hog pen and wood shed, having first removed the former grist mill and clover mill. It was done at their sole expense. Gawin Gilmore paid nothing. The expense of the grist and saw mills was about $3,000. The house and other buildings cost about $1,500. The large house was occupied by Leonard and Hiram, and the other house by persons in their employment. Hiram and Leonard each occupied one half of the house, lived separately, and their expenses were separate, and they carried on business and worked together.

In 1843, L. & H. Gilmore were driven into bankruptcy, and furnished an inventory, individually, and as co-partners. They returned a part of their property as private, and a part as partnership property, under the advice of counsel. The real estate in question was given as private, as being owned one-third by each of them. The inventory was returned under oath.

All the deeds made to the Gilmores, as well as those made to the Gilmores, Hills and Clark, were similar in form and legal effect, so far as is material to this case, to that of Tyler & Andrews to the Gilmores.

All the deeds of conveyance above described were duly acknowledged by the several grantors therein.

The defendants in this case disclaimed as to 1137 undivided 1500th parts of the demanded premises, which were

the whole of the blacksmith shop plot and the grist mill plot, and as to the residue pleaded nul disseizen.

To show themselves seized as administrators of said Grout, the defendants gave in evidence a writ of attachment in favor of Grout, against the firm of L. & H. Gilmore, dated September 6th, 1841, and served by an attachment of the land in question, on the 7th day of September aforesaid, and prior to the time of the service of the writ in favor of George B. Upham, on which this property was attached on the same day, but at a later hour of the day.

The declaration was upon a note of hand, and for money had and received; and it is admitted that the claim for which the action was brought was a just claim.

Judgment was recovered thereon for the sum of $2,624,25 damages and $23,75 costs, at the court of common pleas in this county, on the first Tuesday of February, 1849, and execution was duly issued, and on the 15th day of March, 1849, levied on 363 undivided 1000th parts of two undivided third parts of the blacksmith shop plot and the grist mill plot for the sum of $2,156,22, their respective shares being of the value of $1,078,11.

The *ad damnum* in the writ of attachment was $2,100, and the amount of property directed to be attached was $2,000.

It was objected by the plaintiff that the title of the defendants could not avail them against the levy of the plaintiffs, because the estate levied upon was private property, and the demand, in satisfaction of which the levy was made, was a partnership debt.

It was also objected that the defendants were estopped by their levy, from denying that the demanded premises were the private property of Leonard Gilmore and Hiram Gilmore, in equal shares. Also that the facts in this case render parol evidence incompetent for the defendants, to prove that the premises were purchased with partnership funds for partnership uses, for the purpose of defeating the

plaintiffs' title. That as to the plaintiffs, the premises in question must be regarded as private property.

It was also contended by the plaintiffs that the attachment upon the writ in that case was dissolved, and, therefore, that the levy was void or invalid as against the plaintiffs, the claim of the defendants being by that fact postponed to that of the plaintiffs.

1. Because judgment was taken for more than the *ad damnum* in the writ.

2. Because the sum levied was a greater sum than by the writ the officer was directed to attach, the command in the writ being to attach to the value of $2,000, and the amount levied being $2,156,22.

3. Because at the date of the levy, the Gilmores had obtained their discharge in bankruptcy, and A. F. Snow, their assignee, was not notified to appoint an appraiser.

To disprove the alleged seizin of the plaintiffs the defendants gave in evidence sundry levies upon executions issued upon judgments recovered at the court of common pleas, holden in this county on the first Tuesday of February, 1849, against L. & H. Gilmore, as co-partners, upon partnership demands, one in favor of Laurens A. Grannis, one in favor of Daniel S. Bowker, one in favor of Alonzo R. Vinton, one in favor of William Coates, and one in favor of Laurens A. Grannis, administrator of the estate of Alexander Graham, late of Claremont.

The execution in favor of Grannis was levied upon one undivided fourth part of two-thirds of the demanded premises. That in favor of Grannis, administrator of the estate of Graham, was levied upon twenty-nine undivided one hundredth parts of two-thirds of the premises. That in favor of Vinton was levied upon seventy-three undivided five hundredth parts of two-thirds of said premises. That in favor of Bowker was levied upon fifty-one undivided one thousandth parts of two-thirds of the premises; and that in

favor of Coates upon three undivided twentieth parts of two-thirds of the demanded premises.

The premises were attached upon each of the original writs in the five several actions, prior to the attachment upon the writ in favor of G. B. Upham, and all the executions were levied on the 15th day of March, 1849.

To the foregoing five levies the plaintiffs object.

1. Because the seizin of the plaintiffs, by virtue of their levy and livery of seizin by the officer, cannot be disproved and their title defeated by showing title in a third person.

2. Because if title in third persons can be shown thus in this action, yet in this case that title has not been shown to the whole premises in controversy, inasmuch as the said five levies embrace only eight hundred and eighty-seven one thousandths of two-thirds of the demanded premises.

3. Because if title in third persons can be shown, it has not been done in this case, inasmuch as their claims were partnership debts, and their levies, therefore, cannot avail to convey to them a title to the estate in question, being the private property of the Gilmores, and the claim of the plaintiffs being a private and not a partnership claim,—and no notice to choose appraisers was given to Snow as assignee, and all the levies except those in favor of Coates and Grannis are liable to the objection that judgment is taken in each case for more than the *ad damnum* in the writ, and moreover, more was levied than by the command in the writs was ordered to be attached.

The defendants, upon the completion of their levy, went into actual possession of the demanded premises, and have continued in possession ever since, excepting as affected by the levy of the plaintiffs, and the entry of the officer who made the same, and of the agent and attorney of the plaintiffs who entered into two of the dwelling-houses and into the gristmill, with the officer, to receive possession, and notified the occupants thereof. No objection was made to the taking

the possession, as stated, and Leonard Gilmore, who was there, would say nothing about it any way.

The other four levies of third persons, given in evidence, are similar in form and legal effect to that of Grannis.

A verdict was taken, by consent, for the plaintiffs, for three hundred and sixty-three fifteen hundredth parts of the demanded premises. The case was transferred to this court with an order that judgment be rendered thereon, or the same to be amended and judgment to be rendered thereon, or the same to be set aside and a new trial granted, according to the opinion of this court upon the foregoing case.

*J. Parker*, for the plaintiffs.

I. The premises in controversy are undivided parts of the "blacksmith shop plot," west of the road, and the "grist mill plot," east of the road.

Both parties claim under Leonard Gilmore and Hiram Gilmore, who were formerly partners in four several firms, viz.: 1. The firm of Leonard & Hiram Gilmore," consisting of those persons, formed the fore part of December, 1826. 2. The firm of Gilmore, Hills & Co." consisting of L. Gilmore, Hiram Gilmore, Ilock Hills and Morris Clark, formed soon after the 26th of September, 1827. 3. A firm of the same name, (Gilmore, Hills & Co.,") consisting of Leonard Gilmore, Hiram Gilmore and Ilock Hills, formed on the retiring of Clark, about February, 1828. 4. A new firm of " L. & H. Gilmore," subsequently formed, on the dissolution of the firm of Gilmore, Hills & Co., about October 1st, 1829, consisting of Leonard Gilmore and Hiram Gilmore.

This last firm became bankrupt. The plaintiffs claim by attachment and levy upon the land as the property of Leonard and Hiram Gilmore individually, as tenants in common, the plaintiffs' intestate having been a creditor of those individuals at the time of his death. The defendants claim by a levy in the same manner, alleging now that it is partner-

ship property of the firm of " L. & H. Gilmore," the defendants' intestate having been, at the time of his death, a creditor of that partnership.

Claiming the rights of a creditor of the partnership, it is incumbent on the defendants to show that this was partnership property, belonging to the firm of " L. & H. Gilmore," as a partnership.

The plaintiffs deny that it was ever the property of that firm. They contend that this real estate has never been the partnership property of any of said firms.

This appears from the fact that all the conveyances have been to the grantees and their heirs and assigns, without any mention of partnership ; that there is nothing to show that it was purchased by a partnership ; that in no instance was the consideration money paid by any one of these partnerships, or out of the funds of any one, upon the conveyance to the grantees; and that there was no agreement that the lands, or any part of them, should be held by any partnership, as a part of the partnership assets.

There is, in fact, nothing in the case to show that the land was occupied by any one for partnership uses. The house upon one of the lots in question was occupied by the individual partners in severalty. A partnership use is clearly negatived thus far ; and the evidence is directly against any such use, to a much greater extent; and the fact is not to be taken inferentially as to any part of the property. But upon the supposition that the land, or part of it, was used for the accommodation of the business of the partnership, the case shows that it was the property of the individuals, as tenants in common.

The plaintiffs maintain, notwithstanding any use which may be supposed, that the " blacksmith shop plot" was not originally the partnership property of the first firm of " Leonard & Hiram Gilmore," nor did it become the partnership property of any subsequent firm. Nor was the " grist mill plot " originally purchased by the firm of " Gilmore, Hills

& Co.," nor did it become the partnership property of " L. & H. Gilmore," which firm alone was the debtor of the defendants' intestate. There is no evidence that the several pieces were purchased by any partnership, as such; nor is there a particle of testimony to show an agreement by the partners that any portion of the property should be partnership property; and the use by a partnership, of real estate, the title to which is in the several partners, is entirely consistent with the fact that the title is in them, equitably as well as legally, as tenants in common. Such is usually the truth of the case.

The title to the "blacksmith shop plot" is derived from the conveyance of John Tyler and James B. Andrews, of five-eighths to Leonard Gilmore and Hiram Gilmore, their heirs and assigns, December 27th, A. D., 1826. The consideration was $1000, of which $600 were paid out of the partnership funds of "Leonard & Hiram Gilmore," (the partnership then existing,) and the residue was settled by the joint and several notes of Leonard Gilmore and Hiram Gilmore, with Gawin Gilmore as their surety. Gawin Gilmore had, under these circumstances, the rights of a surety of these individuals, and not of a surety of the partnership. These facts—with the form of the conveyance having no reference to the partnership—show that the partnership funds which were appropriated to the payment, were severed from the partnership property, and thus far divided among the partners.

If this might have operated as a fraud upon the creditors of that partnership, in the event of its insolvency, they found no cause to object, and did not object. The note which was then given was afterwards paid by the firm of "Gilmore, Hills & Co.," which included Clark.

The other three-eighths of the "blacksmith shop plot" were conveyed by Austin Tyler, administrator, to Leonard and Hiram Gilmore, their heirs and assigns, on the 26th of September, 1827. Their individual note, signed by Gawin

Gilmore as surety, was given for this, and said note was paid out of the funds of " Gilmore, Hills & Co."

These payments from the funds of " Gilmore, Hills & Co." were, in like manner, a severance and partition of so much of the partnership funds ; for it is evident that this partnership was not purchasing a partnership interest in the property in proportion to the sums thus paid. And in relation to the residue, the title had been treated as a tenancy in common by the conveyance of undivided interests to Hills and Clark.

The " grist mill plot " was conveyed, half by Austin Tyler, administrator, and half by John Tyler, to Leonard Gilmore, Hiram Gilmore, Ilock Hills and Morris Clark, their heirs and assigns, on the same day that the other lot was conveyed to Leonard Gilmore and Hiram Gilmore, (viz.: September 26th, 1827,) and of course before the partnership of Gilmore, Hills & Co. was formed, since Leonard Gilmore testifies that this latter partnership was formed " soon after the date of the deed to Leonard and Hiram Gilmore," and that " Hills and Clark came in, each purchasing a fourth part of ' grist mill plot,' east of road." How the entire payment was made for the half conveyed by Austin Tyler does not distinctly appear. For the half conveyed by John Tyler, part was paid down, of course not out of the funds of Gilmore, Hills & Co., (which was not then formed,) but, according to the testimony of Leonard Gilmore, Hills and Clark must have paid one fourth each of the whole purchase. For the residue of the purchase from John Tyler, notes, (probably joint and several,) were given. Part of these notes " were paid out of the funds of Leonard and Hiram Gilmore, and the residue of said notes has not been paid." [See Appendix to this argument.] These facts show that the property was not purchased by a partnership, nor conveyed to a partnership, nor paid for by a partnership.

The subsequent transactions show that it was not treated as partnership property. February 3d, 1828, Clark con-

veyed one undivided fourth part of the " grist mill plot " to Leonard Gilmore, Hiram Gilmore, and Ilock Hills, in the regular form of a conveyance from one tenant in common to another, which was their true relation, as appears from the foregoing facts. And Leonard Gilmore testifies that " the other members of the firm purchased out" Clark, and he conveyed to them ; not that the firm of Gilmore, Hills & Co., consisting of the three after Clark left, purchased. The formation of that firm resulted from the purchase ; Clark sold, and then the new firm was formed. Clark never had any interest in the " blacksmith shop plot." And Hills had nothing in it until May 21st, 1829, when Leonard and Hiram Gilmore conveyed to him one third of that. This conveyance is not from or to a partnership. After this time the three were the owners of both plots, and were in partnership, but the facts above stated show that they did not own as partners.

July 29th, 1829, Leonard Gilmore, Hiram Gilmore, and Ilock Hills, conveyed to Gawin Gilmore one undivided fourth part of both plots. October 1st, 1829, Hills conveyed to Gawin Gilmore, Leonard Gilmore and Hiram Gilmore, all his interest in both plots. Gawin Gilmore was never a partner in any of the firms.

If it be said that the first of these conveyances to Gawin Gilmore was to secure him for signing sundry notes for the grantors, it may be answered that the notes which he signed do not appear to have been partnership notes, but the notes of individuals. Moreover, the property was not treated as partnership property, when Gawin Gilmore had a title, absolute on its face, to one third of it. That third has never been regarded as partnership property to this day. If this real estate had been partnership property before, these conveyances to Gawin Gilmore would have turned the title into a tenancy in common, even in equity.

But there were other transactions connected with these, showing still further that this land could not have been held

as partnership property, although the interest was in the individual partners, and to some extent, according to their interest, in the partnership.

November 21st, 1827, Leonard Gilmore, Hiram Gilmore, Hills and Clark, purchased of S. P. Fiske " the store lot." February 23d, 1828, Clark conveyed one fourth to the other three, and July 29th, 1829, they conveyed one undivided fourth part of the same lot to Gawin Gilmore. If there could have been a supposition that this was ever partnership property, it was no longer so.

October 1st, 1829, all the Gilmores conveyed all their interest in " three undivided fourth parts " of this " store lot " to Hills. " For the reason that Gawin Gilmore conveyed his interest in the store, Hills conveyed to Gawin Gilmore his interest " in the two other lots, as before stated. Gawin Gilmore had not a partnership interest in the store. He did not take a partnership interest in the other lots by Hills' conveyance; and here is an additional reason showing that, there is no pretence of a partnership holding, after Hills thus went out.

Leonard Gilmore and Hiram Gilmore undertook to pay the debts of " Gilmore, Hills & Co." But they did not do this as partners under the firm of " L. & H. Gilmore;" it was not a partnership undertaking; they did it as individuals who had been members of the firm of " Gilmore, Hills & Co." And the property which they received, as a consideration for this undertaking, did not become the property of the new partnership, unless made so afterwards.

There was a " clover mill," likewise, which, it would seem, was purchased of Tyler, or Tyler and Andrews, and conveyed to Gawin Gilmore. He gave his note for it, which was indorsed by " Gilmore, Hills & Co." The inference, from the testimony of Leonard Gilmore, seems to be that this was when Clark was a member of the firm of " Gilmore, Hills & Co." The note, it seems, was paid by the new firm of " Gilmore, Hills & Co.," after Clark went out.

Gawin Gilmore conveyed the mill to Leonard Gilmore, Hiram Gilmore and Hills, May 5th, 1829, and they paid the note about that time. This was not a partnership purchase. The partnership did not take a conveyance. Gawin Gilmore gave the note. He took the deed. One firm indorsed the note. Another paid it, and Gawin Gilmore made a conveyance to the individuals, their heirs and assigns.

The title is thus brought to Gawin Gilmore, Leonard Gilmore, and Hiram Gilmore.

It is in evidence that Leonard and Hiram Gilmore built a grist mill, a saw mill, a shingle mill, a horse shed, a house and out buildings, a hog pen and wood shed, at their sole expense. Gawin Gilmore paid nothing. It is not in evidence that this was done with the partnership funds of " L. & H. Gilmore." If it had been, it is not to be inferred that they acted as partners, building a partnership hog pen, wood shed, &c. The house was not partnership property. It was not so used. And the additions thus made cannot be held to be partnership property, because Gawin Gilmore had and held an undivided interest in the land, and the title to the buildings has never been disconnected from the title to the land on which they were erected. The defendants cannot attempt to make any such separation, consistently with their levy.

Each change of the partnership operated as a dissolution of the preceding one, and the formation of a new one. But in no instance did the property of the old partnership become the property of the new partnership.

If, then, it be supposed that this land was once the partnership property of " Gilmore, Hills & Co.," it was never the property of " L. & H. Gilmore." First, because upon a dissolution of a partnership, the several partners become tenants in common of the property, subject only to the rights of the creditors of that partnership. This is emphatically true of real estate. Second, because here actual partition was made of the property of " Gilmore, Hills & Co.," Hills

taking the store, &c., and Gawin Gilmore, Leonard Gilmore and Hiram Gilmore, (not the firm of " L. & H. Gilmore,") taking the blacksmith shop lot and the grist mill lot. Third, because the use of these last lots by " L. & H. Gilmore," and the fact that they erected buildings on them, cannot make these lots the partnership property of that firm. That firm did not purchase, did not pay the purchase money, did not agree to hold it as partnership property, and occupied but part, if any of it, for partnership purposes.

The subsequent transactions are all in accordance with this view of the case. It was treated throughout as the property of Gawin Gilmore, Leonard Gilmore and Hiram Gilmore, as tenants in common, as it should have been. Gawin Gilmore retained his third. Leonard and Hiram Gilmore inserted the other two-thirds in their schedules in bankruptcy, as their separate property, and made oath to this statement. The creditors who attached these two-thirds levied upon them as the estate of Leonard Gilmore and Hiram Gilmore, they " holding equal shares thereof," " in common," &c, and said shares were separately appraised. The defendants' intestate so attached, and they so levied; and these defendants are estopped from now turning round and claiming it through a right, title and interest, different from that on which they levied. They took it as the real estate of tenants in common, and cannot now claim to hold it as the personal property of a partnership, against the separate creditors who levied upon it in the same manner.

Between the two sets of creditors, under all the circumstances of the case, all the equities are with the plaintiffs; and as the legal title is with them also, there is no ground for the court to sustain the claim of the defendants. They cannot prevail, except by showing a superior equity. The mere fact that they levied upon the land as the property of tenants in common, is sufficient to preclude them from insisting upon any such equity.

The case has been considered thus far as if it were the rule that real estate, purchased by partners with partnership funds, and used for the purposes of the partnership, was to be treated as the personal estate of the partnership, and held for the payment of . partnership debts in the first instance, although the title was in the several partners, as tenants in common; but it is not admitted that this is the true principle.

Several of the English cases seem to hold that where real estate is purchased with partnership funds and for partnership purposes, it is to be regarded "out and out" as the personal property of the partnership; and Bisset states this as one of the results of the cases " in the absence of a specific agreement to the contrary." Bisset on Partnership 55. But this doctrine, hardly sustained, perhaps, by the cases cited, is very much shaken by the decision of the vice-chancellor, Sir L. Shadwell, in *Randall* v. *Randall*, 7 Simons 271, 284, 287. See also *Cookson* v. *Cookson*, 8 Simons 529, 548; *Thornton* v. *Dixon*, 3 Brown's Ch. Rep. 199; *Bell* v. *Phyn*, 7 Vesey 450; *Bulmain* v. *Shore*, 9 Vesey 500.

It seems clear that such a doctrine can never prevail in this country, under our registry acts, and acts directing what shall constitute a tenancy in common.

It was held in *Hale* v. ——, 2 Watts 143, that " in order to affect the title or possession of land, it is not competent to show by parol that a deed to two persons as tenants in common, was purchased and paid for by them as partners, and was partnership property. Where partners intend to bring real estate into a partnership stock, that intention must be manifested by deed or writing placed on record." And Mr. Justice *Sargent*, in delivering the opinion, said: " To permit a person, apparently owning property as an individual, to aver a different right in himself, as partner, by which his relations to creditors and others are to be affected, would defeat the statutes of frauds and perjuries." And again, he says " it would even be worse than to pass real estate with-

out writing, since a deed would thus express one thing and mean another; and our recording acts, instead of being guides to truth, would be no better than snares," &c.

In Maine, it has been held that the superior right of the partnership creditors over the creditors of the individual partners, does not apply at common law to real estate purchased with partnership funds, &c.; and a doubt has been expressed whether a different rule should be adopted in equity, against the express provisions of the statute relating to tenancies in common. *Blake* v. *Nutter*, 19 Maine Rep. 16.

In *Heirs of Yateman* v. *Woods*, 6 Yerger 20, it was decided that real estate held by partners, for partnership purposes, descends and vests in the heirs at law of a deceased partner, as in other cases.

In *Anderson* v. *Tompkins*, 1 Brockenbrough, 456, which was a bill in equity, Mr. Chief Justice *Marshall* said : " Real property, whether held in partnership or otherwise, can be conveyed only by deed, executed in manner prescribed by statute. This deed can convey no more title at law than is in the person who executed it. Property conveyed to a firm, or to partners in trust for a firm, is held by them as tenants in common ; and neither party can convey more than his undivided interest." He added subsequently, with reference to the facts of the case, what, it is submitted, the court must find here with reference to the defendants, " I do not think that the superior equity of either party is such as to control the legal estate, or the disposition made by law of the subject. 1 Brock. 463."

The opinion of Mr. Justice *Story* by no means sustains the broad doctrine stated as the result of some of the English cases. " Property purchased with partnership funds," says he, " does not of necessity become partnership property, if that is not the intention of the parties, at least in all cases steering wide of fraud and breach of trust." *Hoxie* v. *Carr*, 1 Sumner 180. And in his treatise on Partnership he limits the conversion to " real estate purchased for the partnership,

and paid for out of the funds thereof,"—" purchased for the use and purposes of the partnership, and chargeable to the same." Story on Partnership § 98.

In *Forde* v. *Herron*, 2 Munf. 366, the fact that " the deed neither describes the parties purchasing as merchants and partners, nor states the purchase to have been made by them for the use of the firm, but merely purports to be a conveyance to them as individuals," is regarded as material and as conclusive in that case, in the absence of notice leading to the supposition that it was partnership property. There seems to be no reason why it should not be so, in a question between the two classes of creditors, and in the absence of fraud. See the opinion of *Tilghman*, C. J., in *McDermot* v. *Lawrence*, 7 Serg. & Rawle 440.

In *Hoxie* v. *Carr*, before cited, Mr. Justice *Story* says, " the circumstance that the payment has been made out of the partnership funds, especially if the property purchased be necessary for the ordinary operations of the partnership business and be actually so employed, will afford a very urgent presumption that it was intended to be held as partnership property, and, in the absence of all countervailing circumstances, it will be absolutely decisive. 1 Sumner 181. If that were the rule, the facts of this case do not bring the property within the conditions of it, because it was not so purchased, and because there are countervailing circumstances in abundance.

But the rule as thus stated is too broad. The principle adopted in *Burnside* v. *Merrick*, 4 Metcalf 537, and *Dyer* v. *Clark*, 5 Metcalf 562, is that " when real estate is purchased by partners, with the partnership funds, for partnership use and convenience, although it is conveyed to them in such a manner as to make them tenants in common, yet, in the absence of an express agreement, or of circumstances showing an intent that such estate shall be held for their separate use, it will be considered and treated in equity as vesting in them, in their partnership capacity, clothed with

an implied trust, that they shall hold it until the purposes for which it was so purchased shall be accomplished, and that it shall be applied, if necessary, to the payment of the partnership debts." This would by no means include this case. There are no debts of " Gilmore, Hills & Co." in question. The property was not purchased with the funds of " L. & H. Gilmore," &c., &c. 5 Metcalf 579, 581. But it is submitted that, in order to warrant the court in going thus far, and applying such real estate (the title to which is in individuals, by a conveyance constituting, according to the rules of law, a tenancy in common,) to the payment of the partnership debts, to the exclusion of the creditors of the individual partners, who may well look to the legal title, there must either be something on the face of the deed to show that it is held by the grantees as partners, or for partnership purposes, or that the circumstances under which the case presents itself must be such that, to hold it to be separate property, will operate as a fraud upon the creditors of the partnership ; (as, for instance, when there had been a withdrawal of the partnership funds, to which they had a right to resort for the purpose of making the purchase, with an evident intent not to sever the funds from the partnership, but to substitute the real estate instead,) or there should be evidence of a knowledge, on the part of the separate creditor, that the property was purchased with the partnership funds, in order to rebut the presumption which might otherwise fairly arise, that he gave credit to it as the property of his debtor.

There are loose dicta in the books, that real estate, purchased with partnership funds, is to be deemed partnership property. Such a general proposition cannot be maintained. But the purchase of real estate by partners, with the partnership funds, and the use of it by the partnership, will not constitute it partnership property, even in equity. It must be necessary for the purposes of the partnership, and the circumstances must show the intention of the partners to

make it a part of the partnership stock. 1 Sumner. The first of these is not shown by the evidence in this case. The second is expressly negatived by their acts after the dissolution.

But adopting the rule in 5 Metcalf, and supposing this to have been the partnership property of " Gilmore, Hills & Co." so far as creditors are concerned, on the dissolution of that firm, and the institution of the new firm of " L. & H. Gilmore," it did not become the partnership property of " L. & H. Gilmore," that is clear. It was subject to the claims of the creditors of " Gilmore, Hills & Co.," and with that exception it was estate held in common. It would not become the partnership property of " L. & H. Gilmore," upon the formation of that firm, for several reasons. As to that firm, it was not purchased with partnership property, but stood real estate, owned by the partners before the formation of the firm, and it is clear that such property does not become partnership property by being used for partnership purposes. No authorities worthy of consideration go to that extent. No agreement is shown that it should become so. The intention of the parties that it should not, is clear by their subsequent acts. The conveyance by Hills of his share to Leonard and Hiram Gilmore and Gawin Gilmore, so far from constituting it partnership property, is directly adverse to such a conclusion.

Besides, supposing it to be the partnership property of " Gilmore, Hills & Co." and subject, as such, to the debts of that partnership, to hold that upon the formation of the new firm of " L. & H. Gilmore," it became the partnership property of that firm, would be in preujdice of the rights of the creditors of " Gilmore, Hills & Co."

If it became the property of the firm of " L. & H. Gilmore," the creditors of the former partnership would be entitled to a preference in satisfaction out of it.

It cannot be held that it became the partnership property of the firm of " L. & H. Gilmore," subject to the rights of

the creditors of " Gilmore, Hills & Co.," to a priority of satisfaction, because that could be held only on the ground of a fraudulent conveyance. But the court will not imply a fraudulent transaction, without evidence, for the purpose of giving to the creditors of the partnership of " L. & H. Gilmore " the benefit of the fraud.

The partners may divide and sever portions of their stock, and convert it into the property of the individual partners, in the absence of fraud. 1 Summer 180; 5 Metcalf 579. The inference is that they do so when they purchase real estate, and take a deed which, by statute, makes them tenants in common, unless there is in the deed itself something to show a contrary intention, or circumstances exist which would render it fraudulent for the separate creditor to take the property. He has the right to look at the record, and is not bound to inquire with what money the estate is purchased.

Farther, Lord *Eldon*, in *Crawsbury* v. *Maule*, 1 Swanston 522, doubted if the principle could be applied to property held by partners previously entitled as tenants in common. And in *Fereday* v. *Wightwick*, 1 Russel & Mylne, 45, the master of the rolls said he was not aware that the particular point had ever been decided; but the distinction, he said, in that case, was that the interest in the mines was expressly acquired for the purpose of the partnership. It is submitted that the principle cannot be applied to the property previously so held by partners, with justice to the separate creditors, as it would enable tenants in common to withdraw their property from their separate creditors, giving to another set of creditors a better right to it. The doubt of Lord *Eldon* can be solved in but one way, in this country, consistently with the authorities here, and with justice to the separate creditors.

It is still further submitted that the principle has no application to the business carried on by these parties after the dissolution of the firm of " Gilmore, Hills & Co." Hills

took the store; Leonard and Hiram Gilmore formed a new partnership, not to continue the business of a previous firm, but to carry on another business, partly, perhaps, like the former, but not a trading concern. The principle has been applied to partnerships formed for trading purposes, for the benefit of trade. The, case, of *Randall* v. *Randall*, before cited, shows that it is not to be applied to a partnership for farming purposes; and there is as little reason for its application to a partnership in a custom shop for blacksmithing, or a custom grist mill, which, it would appear from the case, was the business of these debtors.

For the discussion of other points arising in the case, reference is made to the brief and argument on a former case, reserved in this action.

The " other points," above referred to, are

II. The attachment of Grout was dissolved as against the subsequent attachment by Upham.

1. By the taking of a judgment by the defendants for a greater amount than the *ad damnum* in their writ.

2. By levying upon a greater amount of the property upon which both attachments were made than the amount attached in the action of the defendants.

In support of these positions were cited *Danielson* v. *Andrews*, 1 Pick. 156 ; *Willis* v. *Crocker*, 1 Pick. 204 ; *Fairchild* v. *Baldwin*, 12 Pick. 338 ; *Clark* v. *Foxcraft*, 7 Greenl. 348 ; *Mooney* v. *Kavanagh*, 4 Greenl. 277 ; *Hull* v. *Wallbridge*, 2 Aiken 215 ; *Chickering* v. *Lovejoy*, 13 Mass. Rep. 56 ; *Putnam* v. *Hall*, 3 Pick. 445 ; *French* v. *Eaton*, 15 N. H. Rep. 337.

A further position made in this case is,

III. The levy of the defendants is invalid, because no notice was given to the assignee of the Gilmores in bankruptcy to choose an appraiser. When an execution is extended upon the real estate of a deceased person, his administrator must be notified to appoint an appraiser. *Daniels* v. *Ellison*, 3 N. H. Rep. 288. The third section of

the late bankrupt law provided that by a decree of bankruptcy, the property of the bankrupt should be completely vested in his assignee, and that the assignee should have full power to prosecute and defend all suits pending at the time of such decree, in which the bankrupt was a party. Upon a decree of bankruptcy, the bankrupt became, in some respects, *civiliter mortuus.* It would seem that the assignee represented the bankrupt, with respect to property, as fully as the administrator his intestate.

It is hardly necessary to say any thing in relation to the defendants' position, that the plaintiffs' action can be defeated by showing title in third persons. The plaintiffs claim through Leonard Gilmore and Hiram Gilmore, who were actually seized, and admitted to have been the owners of the demanded premises at the time of the plaintiffs' attachment. *Bailey* v. *March,* 3 N. H. Rep. 274.

## APPENDIX.

Cost of "blacksmith shop plot,.....................$1,550
Cost of "grist mill plot," including clover mill,.......3,455

Total,............................5,005

Amount paid before dissolution of Gilmore, Hills &
Co.,.....................................2,468
Amount paid after dissolution of Gilmore, Hills &
Co., by L. & H. Gilmore,.......................925
Amount never paid,.............................1,612

5,005

The $925 were paid by L. & H. Gilmore, as follows:

On Sabin note,...................................475
On Anna Tyler note,.............................150
On John Tappan note,...........................300

925

The plaintiffs and John W. Tappan now hold the joint and several notes of Gawin Gilmore, Leonard Gilmore and Hiram Gilmore, for the above sum of $1,612.

*Cushing*, for the defendants.

1. The real estate described in the plaintiffs' writ was the property of Leonard and Hiram Gilmore. The judgment on which the plaintiffs' execution was issued, was rendered upon claims against them as individuals. The defendants' judgment was rendered on claims against them as partners.

2. The testimony of Leonard Gilmore is, that said real estate was purchased and improved with the partnership funds of L. & H. Gilmore, and used by them for partnership purposes.

Said real estate was treated as a part of the partnership assets, by the different firms of which they have been members. The interest of Gawin Gilmore did not take the real estate out of the partnership funds, for it appears his deeds were mere securities for money advanced and liabilities incurred for said partners, and that he held said property on a secret trust for the partnership.

The creditors of the partnership are not to be affected by the fact that the Gilmores inventoried said real estate in the schedule of their property in bankruptcy, as separate property, after its attachment. The partnership creditors have a right to show how the property was purchased and used, up to the time of its attachment; and the acts and admissions of the Gilmores afterward are not evidence against the partnership creditors.

It is of no consequence in whom the legal title was vested. The payment of the purchase money of said real estate by L. & H. Gilmore, as partners, raised an implied trust for the partnership.

The equitable interest was in the firm of L. & H. Gilmore. This interest was liable to be attached and taken on execution. The prior attachment of Grout was notice, if

any was necessary, that the real estate in equity was owned by the firm. The fact that they were using said real estate in the partnership business was notice of the trust, and this trust may be shown by parol evidence. *Pritchard* v. *Brown*, 4 N. H. Rep. 397; *Hoxie* v. *Carr*, 2 Sum. 173; *Dyer* v. *Clark*, 5 Met. 563; *Howard* v. *Priest*, 5 Met. 582; *Scoby* v. *Blanchard*, 3 N. H. Rep. 170; Collier on Partnership §§ 134, 135, and notes.

3. The words of the levy express as well the interest of partners as of individual creditors. The Gilmores were equally interested in the partnership; the levy would pass the property against them. The plaintiffs can be in no better situation than the Gilmores, and there is no estoppel.

4. Taking judgment for a larger sum than the *ad damnum* in the writ could only be taken advantage of by writ of error. It is not pretended that claims not described in Grout's declaration were included in his judgment, nor that any of the claims were not lawfully due. The effect upon the plaintiffs is as if the *ad damnum* had been increased by leave of court. Such an amendment would not have dissolved the attachment as against subsequent attaching creditors. A stranger to the original proceedings could not take advantage of any such error. *Smith* v. *Bruce*, 14 N. H. Rep. 67; *Seely* v. *Brown*, 14 Pick. 177; *Haven* v. *Snow*, 14 Pick. 28; *Smith* v. *Keene*, 26 Maine Rep. 411; *Hemenway* v. *Hicks*, 4 Pick. 497.

5. A larger amount of property being applied to satisfy the defendants' judgment than the officer was ordered to attach, will not render their levy void. The entire property was attached on the defendants' writ. The levy must be good for at least two thousand dollars, the sum the sheriff was ordered to attach. *Pierce* v. *Strickland*, 26 Maine Rep. 277; *Durant* v. *Johnson*, 19 Pick. 544.

The plaintiffs cannot take advantage of defects in the levy. The case shows that, prior to any of the levies, the Gilmores had become bankrupts. Their partnership prop-

erty vested in their assignee, for the benefit of their partnership creditors; and the separate creditors could not gain any seizin by levying on the partnership property, against partnership creditors then in possession of the property.

6. Notice to the Gilmores was sufficient. It was all the statute requires. Persons coming in under debtors, after their property has been attached, need not be notified to choose an appraiser. An assignee in bankruptcy has no more rights, in this respect, than a subsequent purchaser would have.

7. The defendants offer in evidence several levies, to show that the title and possession of two-thirds of the property are in third persons. The deeds show the legal title of one-third of the property to be in Gawin Gilmore. This a tenant in possession is permitted to do, to defeat the seizin of a demandant. *Gibson* v. *Bailey*, 9 N. H. Rep. 188; *Bailey* v. *March*, 2 N. H. Rep. 522; *Berry* v. *Brown*, 5 N. H. Rep. 156.

GILCHRIST, C. J. This is a writ of entry to recover possession of the " blacksmith shop lot," west of the road, and " the grist mill lot," east of the road.

The title of the plaintiffs is by a levy on the land, as the property of Leonard and Hiram Gilmore, as tenants in common.

The title of the defendants is by a levy on the land, alleging it to be partnership property, the defendants' intestate having been a creditor of the firm of L. & H. Gilmore.

The first question is, whether the land was or was not partnership property.

There have been four firms of which Leonard and Hiram Gilmore were members.

I. In the month of December, 1826, the firm of L. & H. Gilmore was established, composed of Leonard and Hiram Gilmore.

II. On the 26th of September, 1827, there was made

the firm of Gilmore, Hills & Co., consisting of Leonard Gilmore, Ilock Hills and Morris Clark.

III. In the month of February, 1828, there was made another firm of Gilmore, Hills & Co., consisting of Leonard Gilmore, Hiram Gilmore and Ilock Hills.

IV. On the first of October, 1829, there was made another firm of L. & H. Gilmore, consisting of Leonard Gilmore and Hiram Gilmore.

The condition of the property, so far as it regards partnership interest, is as follows:

1. The "blacksmith shop lot."

On the 27th of December, 1826, John Tyler and James B. Andrews conveyed to Leonard and Hiram Gilmore five-eighths of this lot, in consideration of the sum of $1,000.

Of this sum $600 were paid from the partnership funds, and the remainder was secured by notes which were afterwards paid by Gilmore, Hills & Co. (No. 2, as above.)

On the 26th of September, 1827, Austin Tyler, administrator of Benjamin Tyler, conveyed to Leonard and Hiram Gilmore three-eighths of the "blacksmith shop lot," in consideration of the sum of $581,25. This sum was paid from the funds of Gilmore, Hills & Co. (No. 2, as above.)

2. The "grist mill lot."

On the 26th of September, 1827, Austin Tyler, as administrator, conveyed to Leonard Gilmore, Hiram Gilmore, Ilock Hills and Morris Clark one half of the "grist mill lot," in consideration of the sum of $1,455; and on the same day John Tyler conveyed to the same persons the other half of the "grist mill lot," in consideration of the sum of $1,500.

Of this sum of $1,500, the consideration of John Tyler's deed, the sum of $925, was paid from the funds of L. & H. Gilmore, and a part was paid in cash, but how much does not appear. The rest is unpaid.

"The "clover mill," spoken of in the case, constitutes a part of "the grist mill lot." On the 5th of May, 1829, Gawin Gilmore conveyed it to Leonard Gilmore, Hiram

Gilmore and Ilock Hills, in consideration of the sum of $350,00. For this sum Gawin Gilmore had given his note, payable to Tyler & Andrews, and indorsed by Gilmore, Hills & Co., and it was paid by this firm. (No. 3, as above.)

The aggregate considerations for these deeds appear from the case to amount to the sum of ............... $4,886,25
Of which there has been paid from the partnership
funds the sum of............................2,856,25

Balance,........................2,030,00

The only interest of Gawin Gilmore in the land was by reason of his having become a surety. In consideration of his liability, on the 29th of July, 1829, L. & H. Gilmore and Hills conveyed to him one-fourth of both lots, and he was to reconvey the lands when the notes on which he was surety should be paid. Whatever title he had then was merely in trust.

The substance of what is said in the case about the "store lot," seems to be this: On the 29th of July, 1829, the title to this lot was in the Gilmores and Hills, and on that day they conveyed to Gawin Gilmore one-fourth of it. On the 9th of October, Hills conveyed to the three Gilmores all his interest in the demanded premises, they having conveyed to him, on the first of October, the interest in the store. One deed was in consideration of the other.

It is not expressly stated in the case, but it is to be inferred from the circumstances that the premises were used for partnership purposes.

It is the opinion of *Kent,* 3 Com. 39, note, that where such facts exist it is unnecessary that there should be an agreement among the partners that the land should be considered as personal property; denying the position in *Smith* v. *Jackson,* 2 Edw. 28, which holds an agreement to be necessary. *Kent* says " the decisions on this side of the

question appear to me to be a sacrifice of a principle of policy, and, above all, a principle of justice, to a technical rule of doubtful authority. There is no need of any other agreement than what the law will necessarily imply from the fact of an investment of partnership funds, by the firm, in real estate, for partnership purposes. If the partners mean to deal honestly, they cannot have any other intention than the appropriation of the investment, if wanted, to pay the partnership debts.

The circumstance that the payment has been made out of the partnership funds, especially if the property purchased be necessary for the ordinary operations of the partnership business, and be actually so employed, will afford a very cogent presumption that it was intended to be held as partnership property, and, in the absence of all countervailing circumstances, it will be absolutely decisive."

In cases where the real estate is purchased for partnership purposes and on partnership account, it is wholly immaterial, in the view of a court of equity, in whose name or names the purchase is made, whether of one partner or all, whether in the name of a stranger or of one of the firm. In either case, let the legal title be vested in whom it may, it is in equity deemed partnership property, and the partners are the " *cestuis que trust.*" *Story* J., in *Hoxie* v. *Carr*, 1 Sum. 173, 182, 183. The same doctrine, going equally far, is contained in *Dyer* v. *Clark*, 5 Met. 562, and *Howard* v. *Priest*, 5 Met. 582. We have held in the case of *Jarvis* v. *Brooks*, 3 Foster's Rep. 136, and in numerous other cases referred to by the court, that the creditors of a partnership who have attached the property of a firm, take precedence of creditors of the individual members of the firm, who have attached the same property.

The land, then, being partnership property, and the partners holding it for the benefit of the partnership creditors, the equitable interest is attachable. The interest of a *cestui que trust* in land will pass by the extent of an execution

upon the land as his estate. *Pritchard* v. *Brown,* 4 N. H. Rep. 397. And a subsequent attachment of the partnership property, by a creditor of the firm, will take precedence of a prior attachment of the property by a creditor of an individual partner. *Tappan* v. *Blaisdell,* 5 N. H. Rep. 190.

The declaration by Leonard and Hiram Gilmore, in bankruptcy, that the land was private property, cannot affect the nature of it.

As to the levies.

It is said that the defendants' attachment is dissolved, for certain reasons. But it is not seen how any question arises about the dissolution of the attachment. The defendants' execution being against the partners, takes precedence of the attachment and levy of the plaintiffs. It is, then, immaterial which party had the prior attachment. It would seem that the levy of an execution is good for the amount of the execution and costs. *French* v. *Eaton,* 15 N. H. Rep. 337.

If the execution takes precedence of the plaintiffs' attachment, because it is against the partnership property, it disposes of all the questions relating to the dissolution of the attachment.

It appears from the case that Upham's attachment, on which the plaintiffs rely, was made on the 7th of September, 1841, and his execution was levied on the 30th of August, 1849. The attachment on the writ, in favor of Grout, the defendant's intestate, was also made on the 7th of September, but before Upham's attachment, and the execution was levied on the 15th of March, 1849. Objections are made because the *ad damnum,* in the defendants' writ of attachment, was $2,100, and the amount of property directed to be attached was $2,000, and the sum levied was $2156,22, being a greater sum than the officer was directed to attach for, and because judgment was taken for more than the *ad damnum* in the writ.

Whatever validity there might be in these objections, if the original parties, on both sides, had been creditors of the

firm, no questions concerning them arise at present. The partnership creditors having precedence, nothing more is requisite than that they should have a valid execution, prop-erly levied, in order to avail themselves of their right of priority, and this follows as a necessary result of the princi-ple that their claim is superior to that of the creditors of the individual members of the firm.

The opinion of the court is, therefore, that the plaintiffs are not entitled to judgment.

*Verdict set aside.*